UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

RUDY MANCHA,

                                              **MEMORANDUM & ORDER**
          Petitioner,                            20-CV-953(EK)


               -against-

 DEPARTMENT SUPERINTENDENT,


          Respondent.

------------------------------------x
ERIC KOMITEE, United States District Judge:

          Rudy Mancha petitions this Court for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Proceeding *pro se*, he

challenges his convictions on two felony counts arising from a

2012 burglary in Brooklyn.  Mancha argues that the state

proceedings were tainted by the prosecution's exercise of

racially discriminatory challenges in jury selection, the

presentation of hearsay evidence in violation of the Sixth

Amendment, the ineffective representation he received from

counsel, and certain prosecutorial conduct.

          For the reasons that follow, the petition is denied.

                    **I.    Background**

          In March 2015, following a trial in Kings County

Supreme Court, a jury convicted Mancha of two counts of first-

degree burglary.  The trial court sentenced him to concurrent

twenty-year terms of imprisonment.  He is currently in custody at Sing Sing Correctional Facility in Westchester County, New York.

The Court construes Mancha's petition liberally, as is required for *pro se* litigants.  *E.g.*, *Johnson v. Fogg*, 653 F.2d 750, 753 (2d Cir. 1981).  On that basis, I read his petition to assert four claims.

First, he argues that the State violated his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), by striking all prospective Latino jurors.  *See* Pet. 5, ECF No. 1.

Second, he argues that the State violated his rights under the Sixth Amendment's Confrontation Clause because, in his telling, the expert witness who testified about the DNA evidence "did not conduct[,] witness[,] or supervise" the lab testing that generated the DNA profiles.  *Id.* at 7.

Third, he argues that his counsel was constitutionally ineffective for "failing to properly investigate this case." *Id.* at 8.  However, Mancha's petition nowhere specifies what further investigation his counsel should have performed.  The Court reads Mancha to challenge the reliability of the DNA evidence and to argue that his counsel was constitutionally ineffective for failing to make a hearsay objection to the DNA expert's testimony, as explained below.

2

Fourth and finally, Mancha argues that he was deprived of due process because of unspecified "prosecutorial misconduct." *Id.* at 10.

## II.   Factual and Procedural History

On the day before the burglary in question, Nazroon Rhiman and her fourteen-year-old son, Zahir, were praying at their home in Brooklyn when two men came to the door.  The men left after a brief exchange (as described below), but returned the following night.  When the doorbell rang the second time, Zahir opened it; the smaller of the two men pulled a handgun from his hoodie and pointed it at him.

The two men then forced their way inside the house and physically attacked Nazroon and Zahir.  One man told the other to "[t]ry to get what you can from inside."  After hearing screams, Nazroon's tenant came downstairs, at which point one of the men pointed a gun at her.  When the tenant ran back upstairs to call the police, the perpetrators fled the scene.

### A.   The Investigation

In the immediate aftermath of the crime, the NYPD obtained video and DNA evidence from the scene.  It was substantially later, however, that this evidence led to the identification of Mancha as one of the two perpetrators.

At the time of the crime, three surveillance cameras were in operation at 313 Nichols Avenue, including one by the

front door.  *Id.* at 30.  The view from this camera showed the front stairs, part of the driveway, and the front yard.  *Id.* at 30-31.  Video from that camera showed that when the two perpetrators were fleeing the scene, the larger man fell and hit the gate pillar in the front yard.  *Id.* at 78.[1]

Later that night, Officer Denis Kosta of the NYPD Evidence Collection Team arrived at the scene.  Officer Kosta swabbed the gate pillar where the video showed the larger man striking his head while fleeing.  *Id.* at 137-44.  Kosta also took saliva swabs from Nazroon and Zahir and sent them to the New York City Office of Chief Medical Examiner ("OCME") for DNA testing.  *Id.* at 146-47.  OCME analysts determined that the swab from the gate pillar contained DNA from Nazroon and another person.  *Id.* at 208, 236-37.

In April 2015, after noting a match with the National DNA Index System ("NDIS"), Detective Nicoletta collected a DNA sample from Mancha pursuant to a court order and submitted it to OCME for testing.  *Id.* at 209-10, 269.[2]  When the test results

---

[1] Prior to trial, the NYPD lost the original video of the September 27 incident, which Detective Nicoletta had been given to the NYPD's press information unit to be edited and provided to news outlets.  *Id.* at 256-58.  As a result, at trial, the government introduced into evidence an edited version of the September 27 video and the recording that Zahir had created on his cell phone, over defense counsel's objection.  *Id.* at 61-64.  Mancha does not challenge this evidence in his habeas petition.

[2] OCME analysts uploaded the second contributor's profile into NDIS and found that it matched Mancha's.  State App. Div. Br. 20 n.11, ECF No. 7-6.  To avoid having to inform the jury of Mancha's criminal history — i.e., the

came back, Wing Wong, a forensic analyst in OCME, and his colleagues compared Mancha's DNA profile to the second contributor's and determined that the DNA profiles matched. *Id.* at 210. Mancha was subsequently arrested and tried.

**B.   Trial**

      1.   <u>Jury Selection</u>

         During jury selection, defense counsel leveled an unsuccessful *Batson* challenge based on the prosecution's exercise of peremptory strikes against Latino males.  The prosecution exercised twelve peremptory challenges, three of which were against individuals whom defense counsel identified as Latino: Fernando Monroy, Ranciel Zarzuela, and Mario Pineda. After the strike against Pineda, defense counsel objected:

> I think the People have been striking all the male
> Hispanics during the jury selection.  I know in this
> round . . . there is two male Hispanics and that's the
> second male.  I believe the first one was number four.
> I think he is a male Hispanic as well.  Mr. Zarzuela.
> I know on previous rounds the People have struck male
> Hispanics to[o], with their challenges.  . . .  I
> think it was . . . second round yesterday number five,
> Mr. Fernando Monroy.

Jury Selection Tr. 324:3-14, ECF No. 7-2.  The trial judge, Justice Raymond Guzman, responded, "So you mentioned one person from before and . . . two people from this round.  Counsel, I don't feel you've made a *prima facie* case out.  So, if that was

---

reason his DNA was in NDIS — the State moved to obtain a new sample from him. *Id.*

a *Batson* challenge it's denied." *Id.* at 324:17-22.  Following
this ruling, defense counsel offered no further argument in
support of the *Batson* challenge, and did not renew the challenge
at any point during the remainder of jury selection.

   2.   State's Case-in-Chief

      At trial, the State called six witnesses: Nazroon and
Zahir Rhiman; Seceon Genao, the upstairs tenant; OCME analyst
Wing Wong; Officer Denis Kosta of the NYPD Evidence Collection
Team; and NYPD Detective Vito Nicoletta.

      a.   The Burglary Evidence

      Taken together, the trial testimony of the Rhimans and
Genao established the following.  On the evening of September
26, 2012, Nazroon and Zahir were at home in Brooklyn.  Trial
Transcript ("Tr.") 29-30, ECF No. 7-3.  At approximately 9:00
p.m., the doorbell rang.  *Id.* at 31-32.  Nazroon looked out the
window and saw two men.  *Id.* at 105.  Zahir answered the door,
and one of the men asked about a rental apartment being
advertised in a sign in the window of the house.  *Id.* at 32-34.
Zahir told the man to call his older brother, whose number was
listed on the sign, and the two men left.  *Id.* at 33-34.

      The men returned at approximately 8:30 p.m. the next
day.  *Id.* at 34-38, 107-08.  Zahir answered the door again and
began speaking with the men, and Nazroon followed to the door
about a minute later.  *Id.* at 37-38.  After speaking with Zahir

for approximately two to three minutes, the smaller man nodded at the larger man and then pulled a handgun from the pocket of his hoodie. *Id.* at 38-39, 86-88, 110-12. When the smaller man pointed the gun at Zahir's face, Zahir tried to close the door, but the men forced their way inside the home. *Id.* at 40, 88, 111-12.

A physical altercation ensued, during which the larger man pointed his accomplice's gun at Zahir. *Id.* at 42. The larger man tackled Zahir to the floor and punched him on his neck and sides while Zahir screamed for help. *Id.* at 40-41. The smaller man punched Nazroon in the face, pushed her down to the floor, held her there using his feet and his off-hand, and continued to punch her as she lay pinned on her side. *Id.* at 110-11. One man told the other to "[t]ry to get what you can from inside." *Id.* During this altercation, Nazroon's upstairs tenant, Ms. Genao, heard the screams and walked part of the way down the stairs to see what was happening. *Id.* At that point, the larger man pointed the gun at Genao, causing her to run back up the stairs and call 911. *Id.* at 42-43, 308-11, 313-14. Both perpetrators then ran out of the house. *Id.* at 42-43, 115.[3]

---

[3] None of the three eyewitnesses to the incident — Nazroon, Zahir, and Genao — were able to identify Mancha in court as one of the perpetrators. In their testimony, they referred to the perpetrators as the "smaller" man (who was never apprehended) and the "larger" man, whom the NYPD had determined to be Mancha.

b.    The DNA Evidence

The State offered testimony from Wong, the forensic analyst, regarding the DNA evidence.  The court qualified him as an expert in forensic biology, DNA testing and analysis, and the statistical significance of DNA test results.  *Id.* at 182-83. While other analysts performed the actual testing of the samples, *id.* at 210, Wong testified that he personally analyzed the DNA profiles generated from them.  *E.g.*, *id.* at 209. Specifically, Wong compared the DNA profile of the swab from the gate pillar with the DNA profile of Nazroon and determined that her DNA was included in the sample.  *Id.* at 209.  He further concluded that the sample had a second male contributor.  *Id.* at 209.  Wong compared the second contributor's DNA profile with Zahir's and excluded Zahir as the source.  *Id.*  Then Wong received the DNA sample that Detective Nicoletta collected from Mancha.  *Id.* at 210.  Wong and his team tested that sample and concluded that it matched the second contributor's — i.e., that the DNA recovered from the gate pillar belonged to Mancha.  *Id.* at 212-13.

In support of this conclusion, Wong explained the process for verifying the results of the DNA analysis.  To aid his testimony, he showed the jury a chart — which his team compiled but which he testified he had reviewed for accuracy — comparing the DNA profiles from the gate pillar swab, a

8

duplicate of the gate pillar swab, Nazroon's swab, the DNA profile of the second contributor on the gate pillar swab, and Mancha's swab.  *Id.* at 214-16.  He testified that his OCME team tested the gate pillar swab twice "to make sure that our resource is correct, there was no sample mixup, that the results are consistent with each other."  *Id.* at 216.  Wong then personally compared the results from Mancha's swab and the second contributor's swab and explained that the profiles matched, noting that "[a]t each location [shown], the alleles between the two profiles are the same."  *Id.* at 217-21.[4] Finally, Wong testified that the DNA profile of the second contributor would be exceptionally unlikely to match multiple individuals, stating that "[w]e would expect to see this DNA profile" in only "one in greater than 6.8 trillion people."  *Id.* at 221-222.

After the State rested, the defense presented no witnesses.

## C.   Verdict & Sentence

The trial court submitted two counts of Burglary in the First Degree to the jury: one count of violating P.L. § 140.30(2) (causing physical injury to Nazroon Rhiman while committing a burglary of a dwelling), and one count of violating

---

[4] The defense never objected to Wong's solo introduction of the DNA evidence nor did the defense ever request that the other analysts who worked on the case testify at trial.

P.L. § 140.30(4) (burglary of dwelling while displaying what appeared to be a firearm). *Id.* at 389-95.  The jury found Mancha guilty on both counts.  *Id.* at 463-64.  On May 25, 2015, Justice Guzman sentenced Mancha to concurrent prison terms of twenty years on each count, to be followed by five years of post-release supervision.  Sentencing Tr. 5-6, ECF No. 7-3.

### D.   Appeals & Collateral Proceedings

Mancha timely appealed his convictions to the New York Supreme Court, Appellate Division, Second Department.  He made several arguments, including — as relevant here — (1) that the trial court improperly denied his *Batson* challenge, (2) that the admission of, and testimony regarding, the DNA evidence violated the Confrontation Clause, and (3) that his trial counsel was ineffective for failing to object to the introduction of the State's DNA evidence as hearsay and pursuant to the Confrontation Clause.  *See* Mancha App. Br. ECF No. 7-5.

The Appellate Division affirmed Mancha's convictions and sentence.  *See People v. Mancha*, 75 N.Y.S.3d 276 (App. Div. 2d Dep't 2018).  The panel concluded that Mancha's *Batson* and ineffective assistance claims were without merit, and that Mancha had failed to preserve his Confrontation Clause claim because he had not objected at trial.  *Id.* at 276-77.  Mancha sought leave to appeal to the New York Court of Appeals, which that court denied on September 26, 2018.  *See People v. Mancha*,

111 N.E.3d 1120 (N.Y. 2018).  His conviction became final on
December 25, 2018 — when his time to seek a writ of certiorari
at the United States Supreme Court expired.  *See Gonzalez v.
Thaler*, 565 U.S. 134, 150 (2012).

Mancha also pursued several unsuccessful collateral
attacks on his convictions.  In November 2017, while his appeal
to the Appellate Division was still pending, Mancha moved in the
Kings Country Supreme Court to vacate his judgment of conviction
pursuant to C.P.L.R. § 440.10.  *See* ECF No. 7-11.  The Supreme
Court denied that motion in April 2018 as procedurally barred
under C.P.L.R. § 440.10(2)(c) because it raised issues that
Mancha could have raised on direct appeal but did not.  The
court then went on to deny Mancha's claims on the merits.  *See*
ECF No. 7-13.

On August 20, 2019, Mancha filed a second motion under
C.P.L.R. § 440.10.  *See* ECF No. 7-14.  In that motion, Mancha
argued (again) that the admission of the DNA evidence at trial
violated his confrontation rights.  *See id.*  The Supreme Court
denied the motion as procedurally barred, for two reasons: his
claim had been decided on the merits on appeal, C.P.L.R.
§ 440.10(2)(a), and he had not raised this claim in his first
motion to vacate judgment, C.P.L.R. § 440.10(3)(c).  *See* ECF No.
7-16.  In March 2020, Mancha moved for leave to appeal the state
Supreme Court's denial of his second motion to vacate judgment.

*See* ECF No. 7-17.  That application was denied.  *See People v. Mancha*, No. 8266/2013, 2020-02654 (App. Div. 2d Dep't Aug. 10, 2020).

Mancha filed this petition on February 18, 2020, within the one-year statute of limitations of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See* 28 U.S.C. § 2244(d)(1).[5]  The State acknowledges that Mancha properly exhausted both the *Batson* claim and the ineffective assistance claim relating to Wong's DNA testimony.  *See* Aff. in Opp'n to Pet. ("Opp'n Br.") 3, 16-18, ECF No. 7.[6]  Mancha's Confrontation Clause and due process claims, however, were not preserved in state court and therefore are procedurally barred from habeas review, as discussed below.

### III. Legal Standards

28 U.S.C. § 2254, as amended by AEDPA, governs this application for a writ of habeas corpus for a person in custody

---

[5] Although Mancha filed the petition more than one year after his conviction became final, the petition was nonetheless timely because the limitations period was tolled during the pendency of Mancha's state-level appeals, as the State acknowledges.  *See* State Letter dated June 12, 2023, ECF No. 16 at 1-2 (explaining the procedural history and tolling analysis); *see also Carey v. Saffold*, 536 U.S. 214, 220-21 (2001).

[6] The State views Mancha's petition as raising two separate ineffective assistance claims: first, that his counsel was ineffective for failing to "investigate the case," as stated in the petition, and second, that his counsel was ineffective for failing to object to Wong's testimony about the DNA evidence.  *Id.* at 16-17.  The State argues that while the latter claim is properly exhausted, the former is unexhausted because Mancha never raised it in state court.  *Id.* at 16-18.  As set forth herein, however, the Court reads Mancha to assert one claim — that his counsel failed to challenge the State's DNA evidence on the merits — and concludes that this claim is exhausted.

pursuant to the judgment of a state court.  Under AEDPA, a
petitioner challenging a determination that was "adjudicated on
the merits" in state court must demonstrate that the state
decision "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined
by the Supreme Court of the United States," 28 U.S.C.
§ 2254(d)(1), or was "based on an unreasonable determination of
the facts in light of the evidence presented in the State court
proceeding."  *Id.* § 2254(d)(2).  The state court's findings of
fact are "presumed to be correct," and the petitioner can rebut
this presumption only "by clear and convincing evidence."  *Id.*
§ 2254(e)(1).

A legal conclusion is "contrary to" clearly
established federal law if it "contradicts the governing law set
forth in" the United States Supreme Court's cases or "confronts
a set of facts that are materially indistinguishable from a
decision" of the Supreme Court, yet "arrives at a result
different from [that] precedent."  *Price v. Vincent*, 538 U.S.
634, 640 (2003).  And a decision involves an "unreasonable
application" of federal law "if the state court identifies the
correct governing legal principle" in the Supreme Court's
decisions but "unreasonably applies that principle to the facts
of the prisoner's case."  *Williams v. Taylor*, 529 U.S. 362, 413
(2000).  It is the petitioner's burden to show that the state

court applied the governing principle in an objectively unreasonable manner. *Price*, 538 U.S. at 641.

In the end, it is not enough that the federal court conclude, in its independent judgment, that the state court's decision was incorrect or erroneous: "[A] state court decision must be not only erroneous but also unreasonable. Some increment of incorrectness beyond error is required." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

## IV. Discussion

### A. *Batson* Claim

Mancha first claims that the State violated his rights under *Batson* by striking "[a]ll Spanish people" from the jury pool, citing the challenges against Monroy, Zarzuela, and Pineda. Pet. 5.

In general, trial courts evaluate *Batson* challenges using a three-step framework. *See Johnson v. California*, 545 U.S. 162, 169 (2005). At step one, the defendant must make a *prima facie* case that the proponent of the peremptory strikes acted with discriminatory intent. *Id.* To do so, he must (among other things) proffer facts that give "rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 94. As discussed in greater detail below, he may draw on "a wide variety of evidence" to establish that inference. *Id.* The defendant might show, for example, a sufficient pattern of strikes against

14

prospective jurors of his race. *See Batson*, 476 U.S. at 97. *Batson* did not, however, prescribe in detail the type of "pattern" evidence that would suffice.

If the defendant does not meet his burden at step one, the challenge fails, and the trial court need not reach the second (or third) steps. When the defendant makes the required initial showing, however, "the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes." *Johnson*, 545 U.S. at 168.

Here, the trial court concluded that Mancha had not made the *prima facie* showing, and thus did not reach the second step. While defense counsel argued that the State was "striking all the male Hispanics" from the venire, he merely noted that the State had struck three Latino males. Tr. 324:2-14. He offered no additional context for the challenge, such as the proportion of Latino males who had been struck, or the proportion of all struck jurors who were Latino males. *See Jones v. West*, 555 F.3d 90, 98 (2d Cir. 2009). On this limited record, the trial court denied the challenge. Tr. 324:17-22.

Following trial, Mancha appealed his convictions to the Appellate Division, asserting — among other arguments — that the trial court had erred in denying his *Batson* challenge. Like the trial court, the Appellate Division concluded that Mancha

"failed to make a *prima facie* showing of purposeful discrimination in the People's exercise of peremptory challenges." *Mancha*, 75 N.Y.S.3d at 276.  The court stated that Mancha "merely contended that the prosecution peremptorily challenged the only two Hispanic male jurors who were on the panel of prospective jurors for the fourth round of jury selection and had previously challenged another Hispanic male juror in a prior round." *Id.*  The court therefore held that Mancha "did not offer a showing of facts and circumstances sufficient to raise an inference of purposeful discrimination." *Id.*

The Appellate Division's conclusion was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent on this topic.  The *Batson* Court stated that, in endeavoring to establish a *prima facie* case, "the defendant must show, among other things, that "the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96. And the Court later explained that in some instances, "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors." *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003).  In *Miller-El*, for example, the prosecution "used

peremptory strikes to exclude 10 of the 11 African-Americans eligible to serve on the jury*."*  *Id*. at 326.[7]

But the Court has not specified with precision how this statistical assessment should operate, and has never held that a defendant has made out a *prima facie* case under *Batson* based purely on the number of jurors of a particular ethnicity who were struck.  Instead, the Court has consistently invoked the *denominator* — the total number of jurors of a particular race in the venire — as one of the "relevant circumstances" in assessing statistical evidence.  That denominator was the eleven jurors "eligible to serve" in *Miller-El*, and the four in *Batson*. *See Batson*, 476 U.S. at 83 (referring to prosecution's use of "peremptory challenges to strike *all* four black persons on the venire") (emphasis added); *id.* at 90-91 ("The record in *Swain* showed that the prosecutor had used the State's peremptory challenges to strike *the* six black persons included on the petit jury venire.") (emphasis added) (citing *Swain v. Alabama*, 380 U.S. 202, 210 (1965)).  Likewise, in the more recent case of *Flowers v. Mississippi*, the Court analyzed the use of peremptory strikes against black jurors over the course of six trials in the same criminal case, focusing along the way on the number of

---

[7] Even then, the Court held only that a certificate of appeal should have issued in *Miller-El*'s habeas case — that is, that "the District Court's decision was debatable." 537 U.S. at 348.  The majority did not conclude that the writ should actually issue.  *Id.*

"black prospective jurors against whom the State *could have* exercised a peremptory strike."  139 S.Ct. 2228, 2245-46 (2019) (emphasis added).

Second Circuit precedent also suggests that Mancha did not meet his burden to make out a *prima facie* case of racial discrimination under *Batson*.[8]  Applying *Batson* and its progeny, the Second Circuit has held that when "the asserted *prima facie* case is based upon the use of strikes to exclude all or nearly all of the members of a particular racial group," the record should include both the numerator and the denominator — "how many members of that group were in the venire, and how many of those were struck."  *Jones*, 555 F.3d at 98.  In all cases, the petitioner bears "the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court."  *Overton*, 295 F.3d at 279.

The trial court's ruling on Mancha's *Batson* challenge was not contrary to, or an unreasonable application of, Supreme Court precedent.  Although defense counsel alleged that the prosecution had struck three Latino men from the venire, he did not develop the record at all regarding the number of Latino

---

[8] Second Circuit precedent cannot, by itself, be the basis for granting a habeas petition, in light of AEDPA's focus on clearly established Supreme Court precedent.  But Circuit precedent *contrary* to a petitioner's argument can form a basis for denial, as this court is of course bound by the Second Circuit's interpretation of Supreme Court precedent.  *See generally Serrano v. Fischer*, 412 F.3d 292, 299 n.3 (2d Cir. 2005).

males (or the total number of Latinos) in the venire.  Without
this information, Mancha cannot obtain habeas relief on this
ground.  *See, e.g.*, *Jones*, 555 F.3d at 99; *see also Copeland v.
Walker*, 258 F. Supp. 2d 105, 123 (E.D.N.Y. 2003) (rejecting
*Batson* claim in a habeas petition where, in attempting to
establish a *prima facie* case of discrimination, the "petitioner
did no more than cite the number of challenges against blacks").

**B.   Confrontation Clause Claim**

        Mancha also claims that the State violated his rights
under the Sixth Amendment's Confrontation Clause when OCME
analyst Wong testified about the DNA analysis.  *See* Pet. 7.  He
argues in particular that Wong "did not conduct[,] witness[,] or
supervise the generation of the DNA profiles" that linked Mancha
to the crime.  *Id.*

        The Appellate Division held that Mancha's Sixth
Amendment claim was "unpreserved for appellate review" because
Mancha failed to object to the introduction of the DNA evidence
and testimony at trial.  *Mancha*, 75 N.Y.S.3d at 277.  Given
this, Mancha's claim was procedurally defaulted.  "A federal
habeas court will not review a claim rejected by a state court
if the decision of the state court rests on a state law ground
that is independent of the federal question and adequate to
support the judgment."  *Walker v. Martin*, 562 U.S. 307, 315
(2011).  A state procedural rule is "adequate" to support the

19

judgment if it is "firmly established and regularly followed." *Id*. at 316.  Here, the Appellate Division relied on New York's contemporaneous-objection rule, which the Second Circuit has "held repeatedly . . . is a firmly established and regularly followed New York procedural rule."  *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011).  That rule "constitutes an independent and adequate state law ground for disposing" of a defendant's Sixth Amendment claims in New York state court.  *Id*.

Given the default, petitioner may reach the merits here only by demonstrating both "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that failure to consider the claim "will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, at 750 (1991); *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

Mancha has not demonstrated that cause existed for the default.  To establish cause, Mancha must "show that some objective factor external to the defense" — for example, that the "factual or legal basis for a claim was not reasonably available to counsel" — "impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008).  Mancha offers no argument that cause existed for his procedural default, and the trial transcript reveals no such

reason.  *See, e.g.*, *Campbell v. Lee*, No. 11-CV-7737, 2016 WL 6901425, at *6 (S.D.N.Y. Sept. 29, 2016), *R&R adopted*, 2016 WL 6892766 (S.D.N.Y. Nov. 21, 2016) ("Campbell cannot demonstrate cause for his procedural default because he cannot point to any reason why his trial counsel could not have raised an objection, nor does the trial transcript suggest such a reason.").

Mancha also has not shown that failure to consider his claim would result in a "fundamental miscarriage of justice." *Edwards*, 529 U.S. at 451.  To satisfy the "miscarriage-of-justice exception," the petitioner is required to "establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt."  *House v. Bell*, 547 U.S. 518, 536-37 (2006).  Mancha has not met that burden here (and does not meaningfully contend otherwise in his papers).

## C.   Ineffective Assistance Claim

Mancha raises a claim of ineffective assistance of counsel on the ground that his counsel "fail[ed] to properly investigate this case," but he does not specify any particular steps his counsel should have taken.  Pet. 8.

In his petition, Mancha states that he exhausted this claim by raising it on direct appeal to the Appellate Division. *See id.* at 9.  There, Mancha framed his trial counsel's deficiency as a failure to level a proper objection at trial and

21

a failure to conduct effective cross-examination, rather than a failure to investigate.  He claimed that his "counsel was ineffective for failing to even attempt to discredit the DNA results."  *See* ECF No. 7-5 at 38-39.  Specifically, he argued that his counsel "failed to protect [his] confrontation rights by not requesting to cross-examine the analysts who actually generated the DNA profiles used to identify him," *id.* at 39. Mancha went on to argue that even with the failure to object, his counsel should have at least "questioned Wong about the reliability of the DNA analysis and the possibility of human error or malfeasance."  *Id.*  In the instant petition, Mancha appears to be raising those same arguments.

The Appellate Division rejected Mancha's ineffective assistance claim on the merits, holding that it was "without merit," and that the "record reveals that defense counsel provided meaningful representation."  *Mancha*, 75 N.Y.S.3d at 277.  This holding, to the extent Mancha can be read to challenge it here, was not contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (U.S. 1984), or any other clearly established Supreme Court precedent.

Under *Strickland* and its progeny, to succeed on a claim for ineffective assistance, the defendant must first show that counsel's performance was "outside the wide range of professionally competent assistance" or "fell below an objective

standard of reasonableness." *Id.* at 688-690; *see also Burt v. Titlow*, 571 U.S. 12 (2013) (counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). Second, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  Having held that Mancha's trial counsel provided adequate representation, the Appellate Division did not reach the second prong. *See Mancha*, 75 N.Y.S.3d at 277.  Pursuant to AEDPA, Mancha must show that the Appellate Division "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002).  He has not done so.

First and foremost, it is not obvious that a Sixth Amendment objection to Wong's testimony would have succeeded. At the time of Mancha's trial, the Supreme Court had explained that whether a statement presents a Confrontation Clause issue depends on whether it is "procured with the primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).  Applying this standard in *Williams v. Illinois*, a plurality of the Supreme Court held that the state trial court had not erred by permitting an expert witness to testify about certain DNA evidence even though the expert had not participated in the DNA

23

testing.  567 U.S. 50, 56-58 (2012) (plurality opinion).  The plurality held that even if the DNA report "had been admitted into evidence" for its truth, "there would have been no Confrontation Clause violation" because the "primary purpose" of the DNA report was not to serve as evidence against the petitioner but instead to identify the perpetrator of a rape whom the police had not yet apprehended.  *Id.*  Here, Mancha has not shown that the *primary* purpose of the DNA testing was trial testimony, rather than the effort to identify the still-at-large perpetrator of the burglary.

Moreover, trial counsel may well have refrained from objecting based on legitimate tactical concerns.  When applying the performance prong of the *Strickland* test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 703.  Here, even if a hypothetical objection to Wong's testimony on Confrontation Clause grounds had succeeded, the State could simply have called one or more of the analysts who generated the DNA evidence to testify about the results.  That testimony could have had the effect of "highlight[ing] rather than cast[ing] doubt upon the forensic analysis," *Bullcoming v. New Mexico*, 564 U.S. 647, 667 (2011), and it was a reasonable strategic litigation decision not to further shine the spotlight on such potentially damning evidence.  *See Strickland*, 466 U.S. at 681

("Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."). Indeed, this is one reason why parties regularly reach stipulations about the admissibility of lab reports.

This concern about soliciting potentially damaging testimony applies equally to trial counsel's decision not to challenge Wong's testimony.  Consider Wong's direct examination: he testified that OCME is an accredited lab that meets the national standard for performing DNA testing and undergoes external audits twice yearly.  *See* Tr. 178:18-180:4. And as to this case specifically, he testified "[w]e performed testing twice" to make sure "that the results are consistent with each other" and that "everything is correct."  *Id.* at 216:19-22. Wong also testified that the second contributor's DNA profile, which he determined to be a match with Mancha's, would be seen in only "one in greater than 6.8 trillion people."  *Id.* at 221:14-222:21.  If trial counsel had contested the reliability of this evidence, the effort may well have gone badly: the State may have called an additional witness, buttressing the show of reliability, and Wong might have provided additional testimony proclaiming the rigor and precision of OCME's testing methods, the soundness of the results in this case, and the substantial

likelihood that Mancha was the second contributor to the DNA sample from the gate pillar.  Such testimony could have had the effect of "bolster[ing] the persuasive power of the State's case." *Bullcoming*, 564 U.S. at 667.

Given the foregoing considerations, Mancha's trial counsel acted within the broad contours of objectively reasonable professional assistance by declining to raise a Sixth Amendment objection to Wong's testimony and not challenging Wong about the reliability of the DNA evidence.

**D.  Due Process Claim**

Lastly, Mancha claims a "violation of due process," asserting that he was "deprived of his constitutional right to a fair trial based on prosecutorial misconduct and counsel[']s defective performance."  Pet. 10.  Neither Plaintiff's Petition nor his Reply, ECF. 12 ("Pet. Rep."), explains what prosecutorial actions (or omissions) constituted such misconduct.

Mancha concedes that he has not exhausted this claim, as he is raising it now for the first time.  *See* Pet 10.  He states that "Petitioner has determined that this constitutional claim should be challenged and ha[s] yet to do so."  *Id.* Pursuant to the exhaustion doctrine, "a prisoner seeking to upset his conviction on federal grounds must have given the state courts a fair opportunity to review his federal claim and

26

correct the alleged error." *Dean v. Smith*, 753 F.2d 239, 241 (2d Cir. 1985). Although a federal court may not grant a habeas petition based on an unexhausted claim, it may deny such a claim on the merits. *See* 28 U.S.C. § 2254(b)(2).

Even if Mancha had properly exhausted this claim, it would fail on the merits. Mancha does not say what acts or omissions constituted prosecutorial misconduct or defective performance by counsel. Nevertheless, to the extent that he is referring to the arguments previously raised in his *Batson* and ineffective assistance claims, those arguments fail for the reasons stated above.

### V.   Conclusion

For the foregoing reasons, Mancha's claims are denied as meritless, procedurally barred, or both. Because Mancha has not made a "substantial showing of the denial of a constitutional right," a certificate of appealability will not issue. 28 U.S.C. § 2253. I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and in forma pauperis status is therefore denied for purposes of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962). Mancha, however, has a right to seek a certificate of

appealability from the Court of Appeals for the Second Circuit.

*See* 28 U.S.C. § 2253(c)(1).


                SO ORDERED.

                                    /s/ Eric Komitee
                                   _____
                                   ERIC KOMITEE
                                   United States District Judge

Dated:      December 19, 2023
            Brooklyn, New York